# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| PETER BARTLETT et al., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE et al., <br><br> Defendants. | No. 11-CV-72-LRR <br><br> **ORDER** |

_____

## TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

II.  PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . *2*

III. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
    A.  *Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
    B.  *Events Prior to Suit* . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
    C.  *Motion to Dismiss* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*

IV.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    A.  *Jurisdictional Discovery* . . . . . . . . . . . . . . . . . . . . . . . . *8*
    B.  *Equitable Estoppel* . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*
        1.   **Stone v. United States** . . . . . . . . . . . . . . . . . . . . . . *11*
        2.   **Office of Personnel Management v. Richmond** . . . . . . . . . *12*
        3.   **Parmenter v. Federal Deposit Insurance Corporation** . . . . *13*
        4.   **Harrod v. Glickman** . . . . . . . . . . . . . . . . . . . . . . . *15*
    C.  *Discussion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *16*
    D.  *Alternative Request* . . . . . . . . . . . . . . . . . . . . . . . . . . *18*

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *19*

## I. INTRODUCTION

The matter before the court is Plaintiffs' "Motion for Leave of Court to Conduct Jurisdictional Discovery" ("Motion for Jurisdictional Discovery") (docket no. 28).

## II. PROCEDURAL BACKGROUND

On July 11, 2011, Plaintiffs filed a Complaint (docket no. 2) against Defendants, seeking a declaratory judgment and a writ of mandamus. On October 13, 2011, Defendants filed a "Motion to Dismiss Plaintiffs' Complaint" ("Motion to Dismiss") (docket no. 25). On October 25, 2011, Plaintiffs filed an unopposed "Motion for Extension of Time to Respond to Defendants' Motion to Dismiss Plaintiffs' Complaint" ("Motion for Extension of Time") (docket no. 26). On October 26, 2011, the court granted the Motion for Extension of Time and directed Plaintiffs to respond to the Motion to Dismiss by November 30, 2011. *See* Order Extending Time to Respond to Motion to Dismiss (docket no. 27). On November 30, 2011, instead of responding to the Motion to Dismiss, Plaintiffs filed the Motion for Jurisdictional Discovery. On December 23, 2011, Defendants filed a Resistance (docket no. 31). On January 17, 2012, Plaintiffs filed a Reply (docket no. 34). The court finds that a hearing is unnecessary. The Motion for Jurisdictional Discovery is fully submitted and ready for decision.

## III. FACTUAL BACKGROUND

### A. *Parties*

Plaintiffs are thirty-eight Iowa citizens and other entities—including several corporations, one limited liability company and one general partnership—that farm crops in various counties throughout Iowa. Plaintiffs seek relief against six government entities and officials, alleging that Defendants failed to pay Plaintiffs the amount required for certain crop losses under the Supplemental Revenue Assistance Payment Program ("SURE program") pursuant to 19 U.S.C. § 2497.

Defendant United States Department of Agriculture ("USDA") is the department of the federal government responsible for implementing the SURE program. Defendant Farm Service Agency ("FSA"), a division of the USDA, is the federal agency responsible for implementing the SURE program. Defendant Thomas J. Vilsack is the Secretary of

the USDA. Defendant Bruce Nelson is the Acting Administrator of the FSA. Defendant Iowa State Farm Service Agency, a division of the FSA, is responsible for implementing the SURE program in Iowa. Defendant John Whitaker is the Executive Director of the Iowa State Farm Service Agency. Plaintiffs are suing the individual Defendants solely in their official capacities.

### *B. Events Prior to Suit*

The SURE program became effective in 2008. The purpose of the SURE program is to provide financial assistance in the form of a monetary payment to eligible farmers for crop production and/or quality losses sustained as a result of a natural disaster. *See* 7 U.S.C. § 1531(b). During the 2008 crop year, Plaintiffs sustained losses and sought payment under the SURE program. Plaintiffs believe that Defendants used the wrong "Price Election figures" and improperly calculated Plaintiffs' SURE program guarantees, resulting in underpayment or no payment for Plaintiffs' losses. Complaint at 14. Each Plaintiff appealed the initial SURE program payment determination to each Plaintiff's respective county FSA Committee. The FSA Committee for each Plaintiff's respective county mailed each Plaintiff a letter denying the appeals. Defendants maintain that the letters informed Plaintiffs "that they could then appeal the County Committee determination to the State Committee or the National Appeals Division [("NAD")]." Memorandum in Support of Motion to Dismiss (docket no. 25-1) at 3. Plaintiffs maintain that the letters indicated that Plaintiffs had exhausted their administrative remedies and could proceed with a suit in federal court.

The last paragraph of the first-issued FSA County Committee letter stated,

> The county committee has determined that the issues raised in this appeal are not appealable. You may seek a review of the county committee's determination by filing with either the FSA State Executive Director or the [NAD] Director a written request no later than 30 calendar days after the date you receive this notice according to the FSA appeal procedures

> found at 7 CFR Part 780 or the NAD appeal procedures found at 7 CFR Part 11. If you believe that this issue is appealable, you must write to either the FSA State Executive Director or the NAD Director at the applicable address shown and explain why you believe this determination is appealable. If you choose to seek an appeal ability review of this determination with the FSA State Executive Director, you need not send the NAD Director any information. If you seek an appeal ability review with the NAD Director, provide FSA a copy of your request. If you request an appeal ability review by the State Executive Director and the State Executive Director determines that the issue is not appealable, you will be afforded the right to request an appeal ability review by the NAD Director.
>
> . . . .
>
> If you do not file an appealability review request, your administrative appeal process has been exhausted.

Plaintiff Vierkandt Farms Appeal Letter, Plaintiffs Exhibit 1-7 (docket no. 28-2) at 15-16. The subsequent FSA County Committee letters that were sent to each additional Plaintiff included similar language.

The events leading up to the issuance of the letters are contested. Attorneys Brant Kahler, Douglas E. Gross and Sean Patrick Moore, with the law firm of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C. ("BrownWinick"), represent Plaintiffs in this action. Attorney Gross submitted a Declaration as Plaintiffs Exhibit 1 to the Motion for Jurisdictional Discovery, in which he averred that Kevin Vierkandt, a partner of Plaintiff Vierkandt Farms, first approached him regarding Defendants' administration of the SURE program during the summer of 2010. *See* Gross Declaration, Plaintiffs Exhibit 1 (docket no. 28-2) at 2-6. BrownWinick agreed to represent Vierkandt Farms in its attempt to seek payment under the SURE program. On September 13, 2010, BrownWinick sent a letter to the Hardin County FSA requesting that the amount of Vierkandt Farms' SURE program payment be recalculated. On October 1, 2010, the

4

Hardin County Executive Director, Sandy Hoversten, replied with a letter stating that Vierkandt Farms was not entitled to a payment under its 2008 SURE program application. The letter indicated that Vierkandt Farms had the right to request reconsideration of that decision from the Hardin County FSA Committee within thirty calendar days.

On October 13, 2010, the Hardin County FSA Committee held a hearing on Vierkandt Farms' request for reconsideration. Attorneys Gross and Kahler appeared for Plaintiffs, and Hardin County Executive Director Hoversten and the three members of the Hardin County FSA Committee also appeared. Iowa State FSA employee Kevin McClure participated in the hearing via telephone. Attorney Gross averred that, during the hearing, McClure stated that the "Price Election" issue Vierkandt Farms appealed was not an appealable issue "because it was an issue of general applicability under the SURE [p]rogram that the Hardin County FSA Committee did not have the authority to change." *Id*. at 3. Attorney Gross averred that he was aware of the "administrative appeals process that Vierkandt Farms would have to go through in order to have its case heard in federal district court." *Id*. Attorney Gross averred that he spoke to McClure on October 18, 2010, and expressed his "concern[] about wasting everyone's time and money going through the fruitless and futile FSA/NAD appealability review process, just to end up litigating the appeal in federal district court in the end anyway." *Id*. at 4. Attorney Gross further averred:

> McClure stated that he agreed with me and further indicated that, to avoid the waste of resources inherent in the FSA/NAD appealability review process, he would ensure that the Hardin County FSA's letter denying Vierkandt Farms' appeal would contain language stating that Vierkandt Farms' administrative appeals process had been exhausted at the county level.

*Id*.

On October 19, 2010, Attorney Gross sent the following email to Attorney Kahler:

> Talked to McClure. He is going to write a letter for the

> county committee that will say that it is not an appealable decision and that we have exhausted our administrative remedies. He wants us to get to district court without going through a fruitless NAD process.

Plaintiffs Exhibit 1-6 (docket no. 28-2) at 14. Attorney Gross attached this email to his Declaration. *See id.* Attorney Gross further averred that, on October 20, 2010, he received a letter from Hoversten denying Vierkandt Farms' appeal, and that, "[a]s promised by . . . McClure, the letter stated that the issue [Vierkandt Farms appealed] was not an appealable issue, and the last sentence of the letter stated that '[i]f you do not file an appealability review request, your administrative appeal process has been exhausted.'" Gross Declaration, Plaintiffs Exhibit 1 at 4.

Subsequently, BrownWinick obtained thirty-seven additional clients with issues identical to the issues Vierkandt Farms raised and appealed. Attorney Gross averred:

> McClure worked with BrownWinick to establish a uniform process for each Plaintiff to develop an administrative record at the county level, to ensure that each Plaintiff's appeal to the county level was dealt with in an efficient and timely manner, and to allow Plaintiffs to appeal the "Price Election" issue directly from the county level to federal district court.
> . . . .
>
> True to . . . McClure's word, the final sentence of the denial letter received by each Plaintiff was the same as the final sentence in the October 20, 2010 denial letter received by Vierkandt Farms; namely, "[i]f you do not file an appealability review request, your administrative appeal process has been exhausted." Plaintiff Peter Bartlett Appeal Letter, Defendants Exhibit A (docket no. 25-3) at 2. [B]ased on my conversations with . . . McClure and the express language of the denial letters received by each Plaintiff, I understood that: (1) the "Price Election" issue raised by each Plaintiff was an issue that was not appealable through the FSA/NAD appeals process; (2) each Plaintiff had exhausted its administrative process at the county level; and (3) each Plaintiff had the right to immediately pursue the "Price Election" issue in federal

district court.

*Id.* at 5-6 (internal citation altered). Accordingly, after Plaintiffs received notice that their appeals at the county level had been denied, Plaintiffs initiated the instant action.

### C. *Motion to Dismiss*

Defendants filed the Motion to Dismiss for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). However, the Motion to Dismiss is based largely on the claim that Plaintiffs failed to exhaust their administrative remedies. Defendants argue that "[t]o bring an action in district court against USDA, Plaintiffs must first bring their claim to the [NAD]" under 7 U.S.C. § 6912(e). Memorandum in Support of Motion to Dismiss at 10-11. In the McClure Declaration that Defendants attached to the Motion to Dismiss, McClure averred that "[f]ollowing an appeal to and decision by each of their respective County Committees, none of the . . . Plaintiffs sought further review within the USDA" and "the NAD has never issued a final decision with regard to any of the . . . Plaintiffs." McClure Declaration (docket no. 25-2) at 2-3.

Attorney Gross responded to the McClure Declaration, stating:

> In the numerous contacts and conversations that I have had with . . . McClure over the past 13 months, at no time did . . . McClure ever inform me that our agreement to allow Plaintiffs to appeal the "Price Election" issue directly from the county level to federal district court would no longer be honored, nor did . . . McClure ever give me any reason to believe that BrownWinick's reliance on such agreement was mistaken or misplaced. As a result, when I read the Motion to Dismiss . . . , I was shocked that Defendants would assert and rely on an exhaustion defense. I was particularly outraged that . . . McClure would file a Declaration with the [c]ourt under oath stating that Plaintiffs failed to exhaust their administrative remedies, and yet, at the same time, fail to inform the [c]ourt of his conversations and agreement with me

7

to the contrary.

Gross Declaration, Plaintiffs Exhibit 1 at 6.

## IV. ANALYSIS

In the Motion for Jurisdictional Discovery, Plaintiffs maintain that they intend to argue, in their resistance to the Motion to Dismiss, that "Defendants should be equitably estopped from raising an exhaustion defense due to the representations" McClure made to Plaintiffs' counsel. Motion for Jurisdictional Discovery at 3. Plaintiffs argue that "[b]ecause the majority of the evidence necessary for Plaintiffs to prove their equitable estoppel defense is in the possession, custody and/or control of Defendants, it is necessary that Plaintiffs be allowed to conduct jurisdictional discovery to obtain such evidence prior to the time at which this [c]ourt rules on Defendants' Motion to Dismiss." *Id*. In the event that the court denies Plaintiffs' Motion for Jurisdictional Discovery, Plaintiffs request that the court grant them an additional thirty days from the date of the court's order to file a resistance to the Motion to Dismiss. Defendants resist the Motion for Jurisdictional Discovery and argue that the facts of this case do not support the use of the doctrine of equitable estoppel against the government.

### A. *Jurisdictional Discovery*

Because there is no defined statutory procedure for district courts to follow when ruling on a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), "the mode of its determination is left to the trial court." *Johnson v. United States*, 534 F.3d 958, 964 (8th Cir. 2008). Thus, trial courts have discretion in deciding whether to allow a party to engage in jurisdictional discovery. *See id*. "Courts look to decisions under [Federal Rule of Civil Procedure] 56 for guidance in determining whether to allow discovery on jurisdictional facts." *Id*. at 965. "To request discovery under Rule 56([d]), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of

material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Id.*

In his Declaration, Attorney Kahler explains that the evidence Plaintiffs seek to obtain from additional discovery is set forth in attached interrogatories and requests for production of documents that he prepared for Defendants. *See* Kahler Declaration, Plaintiffs Exhibit 2 (docket no. 28-3) at 2; *see also* Plaintiffs Exhibits 3-5 (docket nos. 28-4 through 28-6). Attorney Kahler averred that BrownWinick, on Plaintiffs' behalf, made two previous attempts to seek the evidence that Plaintiffs now seek through jurisdictional discovery. Specifically, Attorney Kahler averred that he and another BrownWinick attorney engaged in numerous conversations with Defendants' counsel of record, but Defendants' counsel respectfully declined to consent to Plaintiffs' request to conduct jurisdictional discovery. Additionally, Attorney Kahler averred that, as a second means of obtaining the jurisdictional discovery, he prepared and mailed a Freedom of Information Act ("FOIA") request letter, in which he requested documents pertaining to the operation of the SURE program in Iowa for the 2008 crop year. Attorney Kahler averred that "the information, documents and other evidence sought by Plaintiffs through the jurisdictional discovery process pertains to Plaintiffs' assertion that Defendants should be equitably estopped from asserting an exhaustion defense." Kahler Declaration, Plaintiffs Exhibit 2 at 3.

Thus, the Kahler Declaration sets forth sufficient information to apprise the court of the facts Plaintiffs seek through jurisdictional discovery and how they are to be obtained, the efforts Plaintiffs previously made to obtain these facts and why Plaintiffs' efforts were unsuccessful. Plaintiffs argue that, through jurisdictional discovery, they will obtain evidence to show that the government should be equitably estopped from presenting an exhaustion of administrative remedies defense to Plaintiffs' Complaint. However, even if Plaintiffs were to obtain the evidence they seek, it would not support a claim of equitable

estoppel against the government.

## B. *Equitable Estoppel*

The court recognizes that the Supreme Court of the United States has left open the issue of whether, and under what circumstances, equitable estoppel may be applied against the government. *See, e.g.*, *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 422 (1990) (noting that it has left the issue open and complaining that "Courts of Appeals have taken our statements as an invitation to search for an appropriate case in which to apply estoppel against the [g]overnment, yet we have reversed every finding of estoppel that we have reviewed"). Some Courts of Appeals and district courts have seized on the Supreme Court's unwillingness to adopt a flat rule that estoppel may not run against the government under any circumstances and have elected to apply equitable estoppel against the government in certain cases. *See, e.g.*, *Watkins v. U.S. Army*, 875 F.2d 699, 711 (9th Cir. 1989) (estopping the United States Army from relying on a reenlistment regulation to bar the reenlistment of a homosexual soldier). In *Chien-Shih Wang v. Attorney General of the United States*, 823 F.2d 1273, 1276 (8th Cir. 1987), the Eighth Circuit Court of Appeals explained, "The Supreme Court has never upheld an estoppel against the United States. Neither, however, has the Supreme Court or this court accepted the position . . . that the government may not be estopped as a matter of law."

"In order to establish a claim of equitable estoppel against the government, [Plaintiffs] must prove: (1) a false representation by the government; (2) the government's intent to induce [Plaintiffs] to act on the misrepresentation; (3) [Plaintiffs'] lack of knowledge or inability to obtain the true facts; (4) [Plaintiffs'] detrimental reliance; and (5) affirmative misconduct by the government." *Mejia-Perez v. Gonzales*, 490 F.3d 1011, 1012 (8th Cir. 2007). It is not clear what type of conduct qualifies as "affirmative misconduct"; however, the Eighth Circuit has made clear that negligence does not constitute affirmative misconduct. *See Clason v. Johanns*, 438 F.3d 868, 872 (8th Cir.

10

2006) (declining to apply equitable estoppel against the government after appellant relied on the statements of an FSA officer because, "[a]t most, the FSA officer's comments were the product of negligence"). Some commentators have opined that the Supreme Court has "indicate[d] that government employee misconduct must be severe, perhaps to the point of official illegality, before the [Supreme] Court will estop government action." 33 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice and Procedure: Judicial Review § 8407 (1st ed.) (citing *Schweiker v. Hansen*, 450 U.S. 785 (1981)).

The court finds that the following controlling cases are particularly relevant to the court's consideration of whether to allow Plaintiffs to pursue jurisdictional discovery for the sole purpose of uncovering evidence to support its equitable estoppel argument.

### 1. Stone v. United States

In *Stone v. United States*, 286 F.2d 56 (8th Cir. 1961), the Eighth Circuit Court of Appeals considered the application of the doctrine of equitable estoppel against the government. The defendant in *Stone* worked as a producer, buyer and seller of wool in Lucas County, Iowa. *Id.* at 57. The Wool Act of 1954 established a wool program, that the USDA implemented, under which certain incentive payments were made for the sale of wool. *Id.* at 56-57. In 1955, the defendant contacted the Lucas County A.S.C. Office Manager and asked what he needed to do to qualify for the incentive payments. *Id.* at 57. The Office Manager mistakenly told the defendant that he could sell the wool shorn from the sheep on his farms to his wool house, so long as the sales were adequately documented. *Id.* The defendant later submitted two applications for incentive payments, demonstrating that he acted as both the buyer and the seller in the wool transactions. *Id.* The government paid the defendant under the applications; however, the defendant's transactions did not actually qualify for payment under the Act. *Id.* at 56-57. Consequently, the government filed suit against the defendant and sought repayment. The defendant argued the defense of estoppel "by reason of the alleged acts and advice of the

11

representative of the Commodity Credit Corporation." *Id.* at 57. The Eighth Circuit summarily dismissed the defendant's estoppel argument, stating, "Of this it is enough to say that the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." *Id.* at 59 (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 408-09 (1917)).

### *2.* **Office of Personnel Management v. Richmond**

In *Richmond*, 496 U.S. at 417-18, the Supreme Court considered whether the appellant, a retired Navy employee, could assert the doctrine of equitable estoppel against the federal government after he was given erroneous advice from a federal employee. The appellant was eligible for a disability annuity under 5 U.S.C. § 8337(a) because he had impaired eyesight that prevented him from doing his job. *Id.* at 416. The appellant worked part-time as a school bus driver and had an opportunity to earn extra money by working overtime. *Id.* at 417. However, under 5 U.S.C. § 8337(a), an individual is no longer eligible for disability benefits if he or she is restored to an earning capacity comparable to the current rate of pay for the position the individual held at the time he or she retired. *Id.* at 416. The appellant, concerned that he might lose his disability benefits, contacted an employee relations specialist at the Navy Public Works Center's Civilian Personnel Department for advice. *Id.* at 417-18. The specialist erroneously told the appellant that he could take on the extra work without losing his disability benefits. *Id.* Consequently, when the appellant performed the additional work, his income exceeded the statutory eligibility limits, the Office of Personnel Management ("OPM") discontinued payments and the appellant lost his disability benefits for a six-month period. *Id.* at 418.

The appellant sought review of OPM's decision to deny benefits by the Merit Systems Protection Board ("MSPB"). *Id.* MSPB denied the appellant's petition for review and the appellant appealed the case to the Court of Appeals for the Federal Circuit. *Id.*

The Federal Circuit reversed. *Id.* The Supreme Court reversed the Federal Circuit, noting that, despite language in some of its cases recognizing that there may be some extraordinary circumstances in which estoppel would apply against the government, "we have reversed every finding of estoppel that we have reviewed." *Id.* at 419-22.

The Supreme Court explained that "equitable estoppel will not lie against the [g]overment as it lies against private litigants," *id.* at 419, and declined to adopt the position "that the terms of a statute should be ignored based on the facts of individual cases," *id.* at 432. The Supreme Court explained:

> It ignores reality to expect that the [g]overnment will be able to "secure perfect performance from its hundreds of thousands of employees scattered throughout the continent." *Hansen v. Harris*, 619 F.2d 942, 954 (2d Cir. 1980) (Friendly, J., dissenting), rev'd *sub nom. Schweiker*, 450 U.S. at 785. To open the door to estoppel claims would only invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc. Even if most claims were rejected in the end, the burden of defending such estoppel claims would itself be substantial.

*Id.* at 433 (internal citations altered). The Supreme Court ultimately held that estoppel against the government could not apply to situations were a claimant seeks public funds, because "courts cannot estop the Constitution." *Id.* at 434. However, the Supreme Court declined to decide "[w]hether there are any extreme circumstances that might support estoppel in a case not involving payment from the Treasury." *Id.*

### 3. Parmenter v. Federal Deposit Insurance Corporation

In *Parmenter v. Federal Deposit Insurance Corporation*, 925 F.2d 1088, 1089 (8th Cir. 1991), appellants leased and harvested farm land but were not paid under the terms of the lease after the bank that held a security interest on the crop became insolvent. The Federal Deposit Insurance Corporation ("FDIC") was appointed receiver, and appellants maintained that an FDIC employee guaranteed that appellants would be paid under the

13

lease. *Id*. Appellants relied upon the employee's statements and expended a considerable amount of money harvesting the crops. *Id*. at 1090-91. When appellants were not paid, they sued the FDIC. *Id*. at 1089. The Eighth Circuit found that the parties had not adequately presented to the district court the issue of whether the employee had actual authority to bind the FDIC. *Id*. at 1094. Consequently, the Eighth Circuit remanded that issue to the district court for consideration. *Id*. at 1094-95. However, the Eighth Circuit rejected appellant's argument that the FDIC should be equitably estopped from asserting the employee's lack of authority to bind the FDIC. *Id*. The Eighth Circuit explained, "'The doctrine found in agency law of apparent authority does not apply to the government.'" *Id*. at 1094 (quoting *Pia v. United States*, 7 Cl. Ct. 208, 211 (1985)). The Eighth Circuit discussed the Supreme Court's holding in *Richmond*, 496 U.S. 414, and found that the doctrine of equitable estoppel likely did not apply to the facts before it. *Id*. at 1095. The Eighth Circuit continued:

> In any event, it has been held the "government [cannot be] estopped from asserting lack of authority as a defense." *United States v. Killough*, 848 F.2d 1523, 1526 (11th Cir. 1988). This court has stated "'[w]hatever form in which the [g]overnment functions, anyone entering into an arrangement with the [g]overnment takes the risk of having accurately ascertained that he who purports to act for the [g]overnment stays within the bounds of his authority.'" *Leimbach v. Califano*, 596 F.2d 300, 305 (8th Cir. 1979) (quoting *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947)).

*Id*. (internal citations altered). The Eighth Circuit then found that appellants never inquired whether the FDIC employee had actual authority to bind the FDIC and, consequently, appellants "'assumed the risk that [the FDIC employee] was acting within his authority.'" *Id.* (quoting *Miles Farm Supply, Inc. v. United States*, 14 Cl. Ct. 753, 757 (1988)).

### *4.* Harrod v. Glickman

In *Harrod v. Glickman*, 206 F.3d 783, 785 (8th Cir. 2000), the Eighth Circuit addressed an appeal that vegetable farmers raised after they sustained weather-related crop damage in 1989. The vegetable farmers had previously sought and received disaster relief payments from the USDA. *Id.* Such payments were only available to farmers who suffered a crop loss of 50% or more due to weather-related conditions. *Id.* at 786. The vegetable farmers later discovered that their crops had also been damaged when the farmers applied a defective chemical to the crops. *Id.* at 785-86. Consequently, the farmers filed suit against the maker of the defective chemical, E.I. DuPont de Nemours and Company ("DuPont"). *Id.* at 786. Four days before the farmers' case against DuPont went to trial, the USDA's regional counsel's office told them that the government would not be seeking reimbursement for the disaster relief benefits due to a new regulation. *Id.* at 786, 793. The regulation at issue was a statute preventing the government from seeking reimbursement for certain payments made in error after ninety days; however, the statute was enacted after the payments were made, and it was not clear whether the statute applied retroactively. *Id.* at 791.

During the civil case, the farmers informed the district court that the USDA did not intend to seek reimbursement. The district court then allowed DuPont to inform the jury about the government benefits the farmers received due to the weather-related damages. *Id.* at 786. During the civil trial, the farmers maintained that only 30% of their crops were damaged by weather, and not the 50% required in order to receive disaster relief payments from the USDA. *Id.* The government then sought reimbursement for the disaster relief payments it wrongfully made to the farmers. *Id.* The farmers argued, among other things, that they were entitled to equitable estoppel against the government because they relied on a government attorney's oral statement that the USDA would not seek reimbursement. *Id.* at 793. The farmers argued that their reliance adversely affected the outcome of their trial

against DuPont because the jury reduced their damages by the amount of the government benefits they had received. *Id*. The Eighth Circuit held:

> The alleged informal statement of the government's attorney cannot operate to expand the scope of a statute to apply retroactively where Congress has not expressly provided for retroactive effect. *See Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 63 (1984) (noting "those who deal with the [g]overnment . . . may not rely on the conduct of [g]overnment agents contrary to law"). Given the overwhelming weight of the cases holding that estoppel will not lie against the government, it was, in our view, unreasonable for the [farmers] to rely on the oral statement of the government's attorney, particularly when the retroactive effect of the new rule was questionable. We see no basis on which to estop the government from recouping the funds erroneously paid to the [farmers] in this case.

*Id*.

## *C. Discussion*

These cases—and other Supreme Court and Eighth Circuit cases considering the application of equitable estoppel—demonstrate that the doctrine is not generally available in suits against the federal government. *See, e.g.*, *Schweiker*, 450 U.S. at 785; *Merrill*, 332 U.S. at 380; *Clason*, 438 F.3d at 868; *N.D. ex rel. Olson v. Ctrs. for Medicare & Medicaid Servs.*, 403 F.3d 537 (8th Cir. 2005); *Morgan v. Comm'r*, 345 F.3d 563 (8th Cir. 2003). While the doctrine might apply in extraordinary or exceptional circumstances, the court is not aware of any case before either the Supreme Court or the Eighth Circuit where the federal government has been equitably estopped because a government representative gave faulty advice or erroneous information. In their Reply, Plaintiffs attempt to distinguish their case because McClure, the government employee who purportedly told Plaintiffs they did not need to exhaust their administrative remedies, is not a low-level employee, but rather "a high-ranking FSA official charged with the responsibility of overseeing and managing the implementation and operation of the SURE

[p]rogram throughout the entire State of Iowa." Reply at 6. Plaintiffs have not provided the court with any evidence to support its claim that McClure is an especially high-ranking federal government official, nor have Plaintiffs cited any authority to support its position that McClure's rank as a government employee should impact the court's analysis. Regardless of McClure's rank as a government employee, there are no extreme circumstances present in this case that would justify the court's application of estoppel against the federal government. *See Richmond*, 496 U.S. at 434; *see also United States v. Bonderer*, 139 F. Supp. 391, 393-95 (W.D. Mo. 1956) (refusing to apply the doctrine of equitable estoppel against the federal government, despite the defendant's reliance on statements by the Secretary of Agriculture).

The facts Plaintiffs allege in the Motion for Jurisdictional Discovery do not support a finding of affirmative misconduct by the government. *Cf. Morgan*, 345 F.3d at 566-67 (discussing the "heavy burden" to prove affirmative misconduct). Furthermore, Plaintiffs do not allege that McClure knowingly made false statements to Plaintiffs with the intent to induce Plaintiffs to rely on those statements. Consequently, even if the court granted Plaintiffs leave to conduct jurisdictional discovery and Plaintiffs were able to prove everything that they allege in their Motion for Jurisdictional Discovery, the doctrine of equitable estoppel would not apply against the government under the facts of this case.

Even if the court were to assume McClure intentionally encouraged Plaintiffs to file suit directly in federal district court with the intent to lure Plaintiffs into failing to exhaust their administrative remedies, this case would still not support the application of equitable estoppel against the government. In the Motion for Jurisdictional Discovery, Plaintiffs submit that evidence regarding two of the elements required to prove their equitable estoppel defense, namely evidence of lack of knowledge and detrimental reliance, is already in their possession. However, Plaintiffs cannot demonstrate a "lack of knowledge or inability to obtain the true facts," nor can they show reasonable "detrimental reliance."

*Mejia-Perez*, 490 F.3d at 1012.

Plaintiffs admit that they knew they were required to exhaust their administrative remedies and that they were looking for a way to avoid that requirement. Plaintiffs' counsel maintains that they thought they had reached an agreement with McClure to avoid the statutes requiring exhaustion. Although the court is sympathetic to Plaintiffs' claims, the court cannot find that Plaintiffs' counsel's reliance on a purported agreement with a government employee to avoid the law was reasonable. *Cf. Falcone v. Pierce*, 864 F.2d 226, 230 (1st Cir. 1988) (finding that it was unreasonable to rely on advice of a government agent because "those who deal with the [g]overment are expected to know the law and may not rely on the conduct of [g]overnment agents contrary to law" (quoting *Heckler*, 467 U.S. at 63)). Furthermore, Plaintiffs had the knowledge and ability to research whether McClure actually had authority to bypass federal statutes and regulations. Plaintiffs did not take any steps to verify the legitimacy of the purported agreement before relying on McClure's statements. *Cf. id.*

Consequently, even if Plaintiffs were able to obtain evidence to support the three elements for which they now seek discovery—false representation, intent to induce and affirmative misconduct—Plaintiffs are unable to establish the two elements for which evidence is already in their control. The court shall therefore deny the Motion for Jurisdictional Discovery because, even if Plaintiffs obtained the evidence they seek, such evidence would not support an equitable estoppel defense.

### D. Alternative Request

In the event that the court denies Plaintiffs' Motion for Jurisdictional Discovery, Plaintiffs request that the court grant them an additional thirty days from the date of the court's order to file a resistance to the Motion to Dismiss. The court shall grant Plaintiffs' alternative request.

## V. CONCLUSION

In light of the foregoing, the Motion for Jurisdictional Discovery (docket no. 28) is **DENIED**. Plaintiffs shall file a response to the Motion to Dismiss (docket no. 25) on or before March 28th, 2012.

**IT IS SO ORDERED.**

**DATED** this 27th day of February, 2012.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA